**E-FILED**
Tuesday, 15 March, 2016  03:12:45 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| YAUSEAFFE HUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3098 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Yauseaffe Hunt appeals from the denial of his application for Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Hunt has filed a Motion for Summary Judgment (d/e 9), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 12). The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order entered December 31, 2015 (d/e 18).

For the reasons set forth below, the Decision of the Commissioner is REVERSED and REMANDED.

## STATEMENT OF FACTS

Hunt was born on August 21, 1974.  He completed the twelfth grade in school.  He took some special education courses in math and social studies.  He previously worked as an athletic director, community worker, and fundraiser supervisor.  He last worked in the second quarter of 2011.  Hunt earned a total of $4,300.00 in the first and second quarters of 2011.  Certified Transcript of Proceedings before the Social Security Administration (d/e 7) (R.), 31, 35, 122, 242, 487.

Hunt suffers from cocaine-induced cardiomyopathy; congestive heart failure; Level III obesity; hypertension; obstructive sleep apnea; periodic leg movement disorder; chronic obstructive pulmonary disorder (COPD); umbilical hernia status post-surgical repair; diabetes mellitus, Type II; and adjustment disorder with depressed mood.  R. 12.

On October 7, 2010, Hunt went to see a Physician's Assistant Kendra Bowen at Centralia Family Health Center in Centralia, Illinois.  Hunt's blood pressure was 196/125, his pulse was 108, and he weighed 295.5 pounds.  On examination, Bowen heard pulmonary wheezing and rhonchi.  Bowen sent Hunt to the emergency room because of dangerously high blood pressure.  R. 399-400.  The parties do not cite to any medical records from

Hunt's visit to the emergency room on that date.  The Court has also not found any records of an emergency room visit on or about that date.

On March 7, 2011, Hunt saw cardiologist Dr. Malik Rahim, M.D., with complaints of shortness of breath.  Early in the morning on the following day, Hunt experienced severe chest pain.  Early on March 8, 2011, Hunt went to the emergency room at St. Mary's Good Samaritan Hospital in Centralia, Illinois (Good Samaritan).  Hunt reported that he smoked a pack of cigarettes a day.  Hunt also had a history of chronic cocaine abuse. R. 382.  Hunt was diagnosed with an acute myocardial infarction, or heart attack.  Dr. Malik Rahim performed an echocardiogram which showed severe cardiomyopathy, global hypokinesia with low ejection fraction of 20%, concentric hypertrophy and diastolic dysfunction.[1]  R. 378.  At Hunt's request, Dr. Rahim transferred him to a higher level care facility, Barnes Jewish Hospital in St. Louis, Missouri (Barnes Jewish).  R. 383.

On March 8, 2011, Hunt was admitted to Barnes Jewish.  R. 290, 298.  Hunt was six feet tall and weighed 292.4 pounds.  Cocaine use was presumptively positive on the drug screen.  Hunt had a history of high blood pressure and cocaine use.  Hunt reported shortness of breath for two months prior to this episode.  Hunt also reported two pillow orthopnea with

---

[1] Hypokinesis means abnormally decreased motion. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00C.15(c)

several episodes where he was short of breath and had to sit up.  R. 290.[2]
Electrocardiograms (ECG) on March 8, 2011, and March 9, 2011, were
abnormal.  R. 293, 297.  A chest x-ray showed mild cardiac enlargement
and, also, fusion of two lower thoracic vertebral bodies.  R. 296.  Blood
tests on March 10, 2011, showed Hunt's hemoglobin was slightly low.
R. 285.

On March 9, 2011, cardiologist Dr. Ronald J. Krone, M.D., performed
a left coronary angiogram, right coronary angiogram, and left heart
catheterization.  R. 290.  Dr. Krone found severely elevated left ventricle
end diastolic pressure (LVEDP); severe hypokinesis in the ventricles with
ejection fraction of less than 30%; but no coronary artery disease.
Dr. Krone assessed non-ischemic cardiomyopathy.[3]  Dr. Krone
recommended medical therapy with restriction of known cardiac toxins.
R. 291.  Dr. Krone prescribed Coreg, isosorbide mononitrate, and
spironolactone for Hunt's heart condition; and hydralazine and Lisinopril for
his high blood pressure.  R. 301.

On March 9, 2011, Hunt also underwent another echocardiogram.
The test showed a left ventricle end diastolic diameter (LVEDD) of 7.4 cm.

---

[2] Orthopnea is shortness of breath on lying flat.  20 C.F.R. Part 404, Subpart P, Appendix 1,
§ 4.00D.2(b)(i).
[3] Ischemic heart disease is caused by a narrowing of coronary arteries that restricts blood flow to the
heart.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00E.1.

Normal was less than 5.7 cm.  The test showed an ejection fraction of 24%.

The test showed severe global left ventricle (LV) systolic dysfunction.  The

report noted that a risk of sudden cardiac death exists with an ejection

fraction of less than 35%.  R. 294.

On March 25, 2011, Hunt filed his application for SSI.  Hunt alleged

that he became disabled on January 31, 2011 due to two prior heart

attacks, diabetes, high blood pressure, and a hernia.  R. 53, 107, 149, 10,

113, 140, 152.

On April 5, 2011, Hunt went to the emergency room at Good

Samaritan with shortness of breath and chest pain.  R. 314.  An ECG was

abnormal, similar to the March 8, 2011 ECG.  R. 313.  Hunt was admitted

on April 6, 2011.  A screening test was positive for cocaine.  R. 310, 365.

Hunt admitted that he had used cocaine.  R. 309.  An echocardiogram on

April 6, 2011, showed diffuse hypokinesis, LVEDD of 7.5 cm, and an

ejection fraction of 20% to 25%.  R. 311-12.

On April 6, 2011, Hunt told Dr. Rahim that he felt better.  Dr. Rahim

assessed chest pain with slight elevation of troponin in the setting of

cocaine abuse, non-ischemic cardiomyopathy, congestive heart failure, and

hypertension.[4]  Hunt was discharged on April 6, 2011.  Dr. Rahim restarted

---

[4] Excessive levels of troponin enzymes in the blood may indicate myocardial damage.  See R. 524.

Hunt's cardiac and blood pressure medications.  Dr. Rahim also noted,

"The patient had been advised multiple times to stop using cocaine, as that

is most likely the cause of his nonischemic cardiomyopathy, and he is high

risk of mortality if he keeps on using cocaine.  The patient understands it

and agrees for not using cocaine again."  R. 310.

On April 13, 2011, Hunt underwent a sleep study at Good Samaritan

conducted by Dr. Lubna Javed, M.D.  Dr. Javed found that Hunt suffered

from severe obstructive sleep apnea.  R. 418-19.  Dr. Javed recommended

using a Continuous Positive Air Pressure (CPAP) machine while sleeping

at night and weight reduction.  Dr. Javed advised Hunt to "abstain from

driving, operating heavy machinery, and other activities requiring full

concentration until sleep disorder is adequately treated."  R. 430.

On May 2, 2011, Hunt completed a Function Report—Adult Form.

R. 176-83.  Hunt reported that he lived alone in an apartment.  He reported

that in a typical day, he took his medications at 7:00 a.m. and lay back

down until 10:00 a.m.; Hunt reported that during the day he ate, watched

television, and stayed in the house unless he had a doctor's appointment;

in the evening, he took the rest of his medications at 7:00 p.m., and went to

bed at 9:00 p.m.  R. 177.  Hunt reported that he took care of his personal

needs, but tasks took additional time.  He reported that he needed

reminders to shave and to take his medications.  He reported his only

cooking consisted of using a microwave oven to heat frozen dinners.  He

reported that he did laundry daily, and he swept and mopped the floors

twice a week.  R. 178.  He reported that he did not do yardwork.  He

reported that he did not go shopping.  R. 178-79.  He reported that his only

social activities were talking to friends on the phone and visiting with friends

who stopped by his house.  R. 180.  He reported that, "I'm supposed to

wear a CPAP machine at night, but he did not have income or insurance to

get one"  R. 183.

On May 18, 2011, Dr. Julio Pardo, M.D. completed a Physical

Residual Functional Capacity (RFC) Assessment of Hunt.  R. 432-39.

Dr. Pardo opined that Hunt could lift ten pounds occasionally and less than

ten pounds frequently; stand and/or walk at least two hours in an eight-hour

work day; sit for six hours in an eight-hour work day; occasionally climb

stairs and ramps, stoop, kneel, crouch, and crawl; frequently balance; and

never climb ladders, ropes, or scaffolds. Dr. Pardo opined that Hunt RFC

was not otherwise limited.  Dr. Pardo opined that Hunt suffered from

medically determinable impairments of coronary heart disease, Type II

diabetes mellitus, nonischemic cardiomyopathy, benign essential

hypertension, umbilical hernia and severe sleep apnea.  Dr. Pardo opined

that Hunt's May 2, 2011, Function Report "should be considered partially credible."  R. 437.

On May 19, 2011, the Commissioner's examiner completed a Disability Determination and Transmittal form.  The examiner determined that Hunt was not disabled.  The examiner listed a primary diagnosis of chronic ischemic heart disease and a secondary diagnosis of diabetes mellitus.  The examiner relied on Dr. Pardo's RFC determination in reaching this conclusion.  R. 53.

On June 17, 2011, Hunt went to Good Samaritan with complaints of chest pain.  His troponin test was positive.  An echocardiogram showed ejection fraction of 20%.  A stress test showed maximal heart rate of 137 beats per minute with exercise, dilated left ventricle, and ejection fraction of 20% to 25%.  Hunt was given medications Lisinopril and Coreg for dilated cardiomyopathy.  R. 513.

On July 7, 2011, Hunt saw Physician Assistant Bowen for a follow up visit for his diabetes and high blood pressure.  Bowen listed diabetes, hyperlipidemia, obesity, cocaine abuse, hypertension, coronary artery disease, cardiomyopathy, sleep apnea, and smoking as active problems. Hunt reported using a CPAP for his sleep apnea.  Hunt denied any chest pain.  R. 480.  Bowen noted that Hunt had a history of noncompliance with

his medication, but Hunt reported that he was compliant at this time with his blood pressure medications.  R. 480-81.  Hunt denied any illegal drug use, but Bowen stated that drug screen was positive for cocaine.  R. 481. Bowen advised Hunt to work on his diet to control his diabetes and to continue using his CPAP.  R. 482.

On September 12, 2011, Hunt's mother Jana L. Hunt completed a Function Report—Adult—Third Party form.  R. 199-206.  Jana Hunt reported that Hunt lived in a house with his cousin.  She reported that Hunt has a six month old son.  She reported that Hunt was depressed and tired. She reported that he slept with a "C-pak."  R. 200.  She reported that he sometimes needed to be reminded to take his medications.  She reported that Hunt cooked sometimes, but sometimes he "just does not feel like it." R. 201.  She reported that Hunt performed household chores of cleaning, laundry, and ironing, but the chores took a little longer because Hunt became tired easily.  R. 201.  She reported that Hunt went outdoors daily for fifteen to twenty minutes.  He did not drive because he did not have a car or a driver's license.  He went shopping regularly.  She reported that Hunt used to work with youth, but he was not able to anymore.  She reported that Hunt went to church and to sporting events such as high school football games.  R. 203.

On September 16, 2011, Hunt saw Physician's Assistant Bowen for low back pain.  Bowen noted that x-rays showed degenerative joint disease.  Bowen noted that Hunt denied drug use, but drug screen was positive for cocaine.  Bowen identified cocaine abuse as one of Hunt's active problems.  Hunt denied that he had any shortness of breath or chest pain.  Hunt reported that he was out of refills of his cardiac and blood pressure medications.  Hunt denied chest pain or shortness of breath.  On examination, Hunt's blood pressure was 118/70, his pulse was 96, his heart rate and rhythm were normal and his lungs were clear.  R. 478.  Bowen assessed a sprain of the back/degenerative joint disease.  Bowen refilled Hunt's blood pressure and cardiac prescriptions and recommended physical therapy for the back pain.  R. 476-79.

On November 13, 2011, Hunt completed another Function Report—Adult form.  R. 211-13.  Hunt's mother Jana Hunt filled out the form for Hunt.  R. 213.  Hunt reported that he lived in a house with family.  Hunt reported that he wore a "C-pak" while sleeping.  R. 211.  He reported that he had an eight-month old son.  Hunt reported that he spent time with his son at his mother's house or at his own residence.  Hunt reported that he did not need reminders to take care of his personal needs, but sometimes needed reminders to take his medications.  R. 211-12.  Hunt reported that

he cooked meals weekly.  Sometimes he prepared something simple and sometimes he prepared complete meals.  Cooking took more time that it used to.  Hunt reported that he did his own laundry as needed.  R. 213.  He reported that he could not do heavy lifting.  He went shopping for "things that are mandatory to have."  R. 214.  He did not know how long shopping trips took.  R. 214.  He watched sports on television.  He sometimes attended small social gatherings with family and friends.  He regularly attended church and sporting events.  R. 215.

On December 7, 2011, Hunt saw agency psychologist Dr. Fred D. Klug, Ph.D., for a consultative psychological evaluation.  R. 487-91. Dr. Klug assessed Hunt with adjustment disorder with depressed mood. Dr. Klug found that Hunt's immediate memory and long-term memory were intact, but his short-term memory was impaired; his attention span was adequate; his concentration was fair; his overall intellectual functioning appeared to be borderline with poor reasoning ability, thinking, insight, and judgment.  R. 490.

On December 26, 2011, psychologist Dr. Tyrone Hollerauer, Psy.D., prepared a Psychiatric Review Technique.  Dr. Hollerauer opined that Hunt had adjustment disorder with depressed mood, but his impairment from his mental disorder was non-severe.  R. 492-505.

On December 29, 2011, Dr. Charles Wabner, M.D., reviewed and reaffirmed Dr. Pardo's assessment of Hunt's physical RFC.  R. 506-08. Dr. Wabner opined that the medical evidence covering the period since Dr. Pardo's RFC assessment "does not change the initial RFC."  R. 508.

On December 30, 2011, the Commissioner's examiner again completed a Disability Determination and Transmittal form.  The examiner determined on reconsideration that Hunt was not disabled.  The examiner listed the primary diagnosis as chronic ischemic heart disease and the secondary diagnosis as diabetes mellitus.  The examiner relied on Dr. Wabner's review and reaffirmation of Dr. Pardo's RFC assessment. R. 54.

On April 5, 2012, Hunt went to an office visit at Good Samaritan. Hunt was noncompliant in taking his medications for his heart condition. R. 513.

On April 10, 2012, Hunt went to the emergency room at Good Samaritan with complaints of chest pain.  R. 536.  His drug screen test was negative.  R. 546.  He was given aspirin, Zofran, and morphine.  His condition improved with the Zofran and morphine.  At discharge, his blood pressure was 135/84 and his pulse was 60.  R. 536-541.  Blood test

showed that Hunt's red blood cell count, hemoglobin and hematocrit were below normal.  R. 547.

On October 2, 2012, Hunt went to the emergency room at Good Samaritan with complaints of cough, chest pain, shortness of breath on exertion, and mild ankle edema.  Hunt was assessed with acute bronchitis and was admitted.   Cardiologist Dr. Erik Funk, M.D., treated Hunt. Dr. Funk noted that Hunt's cardiac enzymes were generally flat but serum troponin values were slightly elevated.  His blood pressure was 152/90, and his pulse was 96.  A chest x-ray demonstrated congestive heart failure. Blood test showed that Hunt's red blood cell count, hemoglobin and hematocrit were below normal.  R. 511-514, 521, 531-33.

Hunt was discharged on October 4, 2012.  Dr. Funk's discharge diagnosis was atypical chest pain with secondary diagnoses of nonischemic cardiomyopathy, uncontrolled hypertension, medication noncompliance, obesity, and Type II diabetes.  Hunt was given antibiotics for the bronchitis and his other medications due to his lack of funds.  The discharge notes indicate that Hunt agreed to apply for Medicaid.  Dr. Funk recommended placement of a single chamber internal cardioverter-defibrillator device once Hunt secured medical coverage.  R. 511-14.

On January 7, 2013, the Administrative Law Judge (ALJ) held an evidentiary hearing in this case.  R. 26-52.  The ALJ conducted the hearing in Evansville, Indiana.  Hunt and his attorney appeared by videoconference from Illinois.  Vocational expert Matthew Sprong appeared by telephone. R. 28.

Hunt testified first at the hearing.  Hunt testified that he was thirty-eight years old, he completed the twelfth grade, and he did not have a driver's license.  Hunt was six feet tall and weighed 295 pounds.  R. 32. Hunt testified that he lived with his girlfriend and three children ages three, six, and nine.[5]   R. 33.

Hunt testified that he worked as a coach or athletic director at a youth center.  Hunt also testified that he performed various jobs for which he was paid by the Illinois Department of Rehabilitation Services.  Hunt testified about stopping this work, "I think the reason why I stopped is because I was trying to apply for disability, and I didn't want to mess my disability chances up."  R. 36.

Hunt testified that he spent a typical day, "Sitting down, watching TV, and dozing off here and there."  R. 37.  He testified that he typically got up about 7:30 or 8:00 a.m.  Hunt testified that he typically dozed off about six

---

[5] Hunt did not testify whether he was a parent or guardian of any of the children.

or seven times from the time he woke up until 5:00 p.m.  He testified that he slept forty-five minutes to an hour each time he dozed off.  Hunt testified that on his bad days, he does not get out of bed.  He testified that he stayed in bed all day about three to four days a week.  Hunt testified as to the reason for his sleepiness, "Tired.  Somewhat pain too, and my breathing."  R. 38.

Hunt testified that he experienced shortness of breath with any movement.  He testified that he did few chores during the day, "I might wash a few dishes.  That's about it.  I don't do too much because I ain't to do like I want to do."  R. 39.  Hunt testified that he could not do anything more than a few dishes because he could not stand "because my ankles swell up quick."  R. 39.  Hunt testified that his ankles were swollen at the hearing as a result of walking from the parking lot to the hearing room.  Hunt testified that he experienced numbness in his feet when they swelled.  R. 39-40.  Hunt testified that he elevated his feet to control the swelling.  R. 40.

Hunt testified that he did not sleep at night.  Hunt testified that he no longer used a CPAP because he could not afford it.  R. 40.

Hunt testified that he went to school events when he was able.  R. 41.

Hunt testified that he had chest pain sometimes if he overexerted himself.  Hunt controlled the pain by taking medicine and relaxing.  R. 42.

Hunt testified that he had not used cocaine in a long time.  Hunt testified that he did not use cocaine after the second time he went into the hospital for heart problems.  R. 43.  Hunt testified that he took his medicine as prescribed.  R. 44.  Hunt said he went without his medications in the past because of the cost.  He testified that he went without medication for six months once.  He testified, "And that cause me to have the first heart attack."  R. 45.  Hunt testified that after his second heart attack, he went without his medication for three months once due to the cost.  R. 45.

Vocational expert Sprong then testified.  The ALJ asked Sprong the following:

> Please assume a younger individual who has a high school education, shares the past, relevant work, and has the following residual functional capacity:  could perform the physical exertional demands of sedentary work as defined by the regulations; could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolding; could frequently balance; could only occasionally stoop, kneel, crouch, and crawl.  Would there be any unskilled occupations an individual with this profile and residual functional capacity could perform?

R. 47.  Sprong opined that such a person could work as surveillance-system monitor, with16,800 such jobs in existence nationally, and 600 in Illinois; call-out operator, with 16,000 in existence nationally, and 600 in

Illinois; ad addresser or addresser, with 25,200 in existence nationally, and 720 in Illinois.  Sprong testified that these were representative samples of the jobs that such a person could perform.  R. 47-48.

The ALJ refined his hypothetical question:

> [Y]ou should further consider that the individual should also avoid concentrated exposure to hazards such as exposed moving machinery that's used to cut or grind and that fails to stop when human contact is lost, unprotected heights, or the operation of . . . motor vehicle equipment.  And that the individual should avoid concentrated exposure to fumes, odors, dusts, gas, areas of poor ventilation.  So the individual could not work in settings with levels of respiratory irritants similar to what you might find in a chemical plant, a farm, or an automotive garage.  Is there change in the result?

R. 48.  Sprong testified that individual could still perform the three jobs he previously identified.  R. 48.

The ALJ added a third set of limitations to the hypothetical question:

> For question three, if you consider that the individual, due to a moderate degree of difficulty maintaining concentration, persistence, or pace, could understand, remember, and carry out rote or routine instructions that would require the exercise of little independent judgment or decision making for two-hour work segments but couldn't [follow complex or detailed instructions]."

R. 49.  Sprong opined that such person could not perform the call-out operator position.  Sprong opined that such a person could perform the job of clerk/document preparer, with 98,000 such jobs in existence nationally, and 3,500 in Illinois.  R. 49.

The ALJ then asked Sprong to assume the person needed two additional unscheduled, fifteen-minute breaks a day due to fatigue.  Sprong opined that such a person could not work.  R. 49-50.  The ALJ then concluded the hearing.

<u>THE DECISION OF THE ALJ</u>

On February 5, 2013, the ALJ issued his decision.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569

(7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ found that Hunt met his burden at Steps 1and 2.  He has not

engaged in substantial gainful activity since he applied for SSI on March

25, 2011.  The ALJ found that his employment in the first two quarters of

2011 did not reach the level of substantial gainful activity.  The ALJ also

found that Hunt suffered from severe impairments of cocaine-induced

cardiomyopathy; congestive heart failure; Level III obesity; hypertension;

obstructive sleep apnea; periodic leg movement disorder; chronic

obstructive pulmonary disorder (COPD); umbilical hernia status post-

surgical repair; diabetes mellitus, Type II; and adjustment disorder with depressed mood.  R. 12.  The ALJ rejected Dr. Hollerauer's opinion that Hunt had no severe mental limitations in light of Hunt's subjective reporting and Dr. Klug's mental status examination.  R. 14.

The ALJ found that Hunt's impairments or combination of impairments did not meet or equal any Listing.  The ALJ considered the following Listings:  3.02 for COPD; 4.04 for ischemic heart disease; 3.10 for sleep apnea; 9.00 for diabetes; and 12.04 for affective disorders such as depression and 12.09 for substance addiction disorder.  The ALJ found that Hunt's mental impairments resulted in mild limitations on performing activities of daily living and social functioning and moderate limitations on concentration, persistence, and pace.  R. 14.

At Step 4, The ALJ found that Hunt had the RFC to perform sedentary work except that he: (1) could (a) only occasionally climb ramps and stairs; (b) never climb ladders, ropes, or scaffolding; (c) only frequently balance; occasionally stoop, kneel, crouch, and crawl;  (2) must avoid (a) concentrated exposure to hazards such as unprotected heights; (b) the operation of commercial motor vehicle equipment; (c) exposure to hazards such as moving machinery used to cut or grind and that fails to stop when human contact is lost; and (d) exposure to fumes, odors dusts, gases and

areas of poor ventilation; and (3) is limited to jobs which only require him to understand, remember, and carryout rote or routine instructions that require the exercise of little independent judgment or decision making for two-hour work segments, but not if the tasks are detailed or complex.  R. 15.

In reaching this conclusion, the ALJ relied on Hunt's activities of daily living reported by him and his mother in the three Function Report forms. The ALJ found that Hunt could dress himself, take care of his personal hygiene, cook meals, do laundry, shop, ride in a car, attend social gatherings, and regularly go to church and sporting events.  R. 16.  The ALJ found that his reported level of activity "requires a level of mental capacity, tolerance for exertion and postural movements, and fine/gross manipulations abilities consistent with performing certain unskilled sedentary work."  R. 16.

The ALJ relied on Dr. Pardo's RFC determination for the postural limitations in the RFC.  The ALJ, however, put less weight on Dr. Pardo's opinion that Hunt could perform light work in light of the clinical findings in the medical record and Hunt's subjective reporting of his limitations. R. 18.

The ALJ found that his impairments were not as disabling as Hunt claimed, in part, because he regularly failed to comply with his prescribed

regimen of medication and because of his repeated use of illegal drugs and alcohol.  The ALJ found that Hunt's cardiac condition was controlled with medication.  The ALJ found that Hunt's cardiac events resulted "from the claimant's failure to take medications and his chronic cocaine use."  The ALJ found that Hunt's intermittent chest pain was controlled with medication and relaxation, and his ankle edema was alleviated by elevating his feet.  R. 17.

The ALJ accommodated Hunt's breathing difficulties and COPD by restricting him to jobs that avoided exposure to "respiratory irritants."  R. 17. The ALJ further discounted Hunt's testimony about difficulty breathing in light of his testimony that he smoked a pack of cigarettes a week.  R. 17, 18.   The ALJ found that Hunt's obesity exacerbated the limitations caused by his cardiovascular and pulmonary conditions, and the restrictions in the RFC to a limited range of sedentary work were consistent with the exacerbation caused by his obesity.  R. 18.

The ALJ accommodated Hunt's mental limitations by limiting him to jobs which only require him to understand, remember, and carry out rote or routine instructions that require the exercise of little independent judgment or decision making for two-hour work segments, but not if the tasks are detailed or complex.  The ALJ noted that Dr. Klug found "some deficits in

concentration and cognitive abilities," but "Dr. Klug also noted an adequate attention span, an intact immediate and long-term memory, and a good new learning ability."  R. 14.  The ALJ found that, "The claimant's depression and fatigue affect his ability to maintain concentration, persistence, and pace, to an extent that is consistent with the determined limitations to task complexity."  R. 18.

In making these findings, the ALJ found that Hunt's testimony at the hearing was not credible.  The ALJ stated, "The claimant testified to difficulty sleeping and chronic excessive daytime fatigue; chest pain and shortness of breath upon exertion; elevated blood pressure; and swelling/numbness in his ankles with standing and/or walking."  The ALJ further noted that Hunt testified that "he naps approximately 4 to 5 hours per day and stays in bed all day 3 to 4 days a week."  The ALJ found that this testimony was inconsistent with the Function Reports in which he stated that he was able to "perform all activities of daily living; spend time with his 8 month old son, maintain interpersonal relationships with his girlfriend and family; and attend social events and go to church regularly." R. 17.

The ALJ also considered the fact that Hunt testified that he quit work to apply for disability.  The ALJ found that there was no evidence of a

significant deterioration in Hunt's condition since he quit work.  The ALJ stated, "This evidence raises a question as to whether the claimant's continuing unemployment is actually due to his medically determinable impairments."  R. 17.

The ALJ found at Step 4 that Hunt could not return to his past relevant work as an athletic director in light of his RFC.  R. 18.

At Step 5, the ALJ found that Hunt could perform a substantial number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and on the opinions of vocational expert Sprong that a person with Hunt's age, education, experience, and RFC could perform the jobs of surveillance system monitor, document preparer, and addresser.  R. 19.  The ALJ, therefore, concluded that Hunt was not disabled.  R. 19-20.

Hunt appealed the ALJ's decision.  On February 14, 2014, the Appeals Council denied Hunt's request for review.  The decision of the ALJ then became the final decision of the defendant Commissioner.  R. 1. Hunt then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial
evidence, and may not substitute its judgment.  Delgado v. Bowen, 782
F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility
determinations of the ALJ unless the determinations lack any explanation
or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.
2008).  The ALJ must articulate at least minimally his analysis of all
relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).
The ALJ must "build an accurate and logical bridge from the evidence to his
conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ did not articulate his analysis at Step 3 of
whether Hunt's condition met or equaled Listing 4.02 for chronic heart
failure.  The ALJ stated in one sentence, without any analysis, "The
claimant's cardiovascular impairments, singly or in combination, do not
meet Listing 4.04 because the evidence fails to establish the criteria
outlined in 4.04A, B, or C."  R. 13.  Listing 4.04 concerns ischemic heart
disease.  Hunt had nonischemic cardiomyopathy and congestive heart
failure.  R. 291, 310, 437, 511-14.  Ischemic heart disease is caused by a
narrowing of coronary arteries that restricts blood flow to the heart.  Listing

4.00E 1.  Chronic heart failure is the inability of the heart to pump enough

oxygenated blood to body tissues.  Listing 4.00D1.  The medical records

consistently indicated that Hunt's primary heart condition was nonischemic

and resulted in congestive heart failure and an inability to pump

oxygenated blood reflected in the low ejection fraction on March 8 and 9,

2011, April 5, 2011 and June17, 2011.  See R. 394, 295, 311, 513.  These

conditions were consistent with chronic heart failure.  See Listing 4.00D1.

The ALJ, however, failed to even mention the Listing 4.02 for chronic heart

failure.

The ALJ needed to address whether Hunt's condition met or equaled

Listing 4.02.  Listing 4.02 states, in part:

> 4.02 Chronic heart failure while on a regimen of prescribed
> treatment, with symptoms and signs described in 4.00D2. The
> required level of severity for this impairment is met when the
> requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1.     Systolic failure (see 4.00D1a(i)), with left ventricular end
> diastolic dimensions greater than 6.0 cm or ejection fraction of
> 30 percent or less during a period of stability (not during an
> episode of acute heart failure); or
>
> . . . .
>
> AND
>
> B. Resulting in one of the following:

      1.     Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom [a Medical Consultant], preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual;

20 C.F.R. § Part 404, Subpart P, Appendix 1.  Hunt had two heart attacks in March and April 2011.  Those episodes showed ejection fractions of 30 percent or less, but those test results occurred during periods of acute heart failure, and so, would not appear to meet Listing 4.02A1.  Hunt's June 17, 2011, stress test, however, showed an ejection fraction of 25% at a time when he was not having a heart attack.  R. 513.  Hunt had additional cardiac episodes in April and October 2012.[6]  Dr. Funk concluded in October 2012 that Hunt needed an internal cardioverter-defibrillator. R. 512.  Given this evidence, the ALJ should have addressed whether Hunt's condition met or equaled the requirements of Listing 4.02A.1, quoted above.

The Court is not commenting on the merits of whether Hunt's condition met or equaled Listing 4.02A.1.  The ALJ would need to evaluate all of the relevant evidence, including matters such as the low ejection fractions noted above, Hunt's compliance with his medications, and Hunt's

---

[6] He also had severe hypertension in 2010.  R. 399-400.

use of cocaine.  In addition, the ALJ may also need to consider whether Hunt's other impairments (such as COPD, diabetes and obesity), in combination with his heart condition, equaled the severity of the condition described in Listing 4.02A.1.  If Hunt's condition met or equaled Listing 4.02A.1, the ALJ would need to determine whether a medical consultant needs to evaluate whether Hunt could perform an exercise stress test for purposes of Listing 4.02B.1.  There is no evidence of this in the record.

The evidence shows that Hunt had some level of chronic heart failure.  The ALJ was required to determine whether Hunt's nonischemic heart condition resulting in chronic heart failure met a Listing.  The ALJ said nothing about the issue.  That was error.  The error is material and requires reversal.  On remand, the ALJ must analyze the applicability of Listing 4.02 to this case, and articulate that analysis, including the 4.02B.1 requirement discussed above..

The Commissioner argues that the ALJ did not err because he is not required to explicitly refer to any particular listing.  See Rice v. Barnhart, 384 F.3d 363, 369-70 (7th Cir. 2004).  That may be true, but he ALJ must still minimally articulate his analysis of all of the material evidence.  Herron, 19 F.3d at 333.  The material evidence here shows a man with a heart

condition that fits the Listing's definition of chronic heart failure.  A minimal articulation of the evidence in this case required some explanation at Step 3 of whether the severity of his impairments met or equaled the 4.02 Listing for chronic heart failure.  The ALJ failed to do so.  That was error.

The Commissioner argues that Drs. Pardo and Wabner opined that Hunt's condition did not meet a Listing.  The Court has reviewed their opinions and finds no discussion of Listings.  <u>See</u> R. 432-39, 506-08.  The Commissioner cites the Disability Determination and Transmittal forms as evidence that Hunt did not meet a Listing.  The examiners who completed those forms erroneously identified Hunt's primary diagnosis as chronic ischemic heart disease rather than nonischemic.  R. 53-54.  Those examiners committed the same error that the ALJ committed when he considered the Listing for ischemic heart disease rather than the Listing for chronic heart failure.

The ALJ erred when he failed to analyze whether Hunt's heart condition met or equaled Listing 4.02 for chronic heart failure and to minimally articulate that analysis.  The error is material and requires reversal and remand for further proceedings.

Hunt raises three other points of error: (1) whether the ALJ erred in his determination of Hunt's RFC; (2) whether the ALJ erred in evaluating

3:14-cv-03098-TSH   # 19   Page 30 of 30

Hunt's credibility; and (3) whether the decision is supported by substantial evidence.  The resolution of these issues could be affected by the ALJ's revised analysis at Step 3.  The Court, therefore, will not rule on these claims of error.  The Court notes that the record supported the ALJ's determination that Hunt's testimony at the hearing was contradicted by his May and November 2011 Function Reports, and by his mother's September 2011 Function Report.   R. 16.

THEREFORE, Plaintiff Yauseaffe Hunt's Motion for Summary Judgment (d/e 9), is ALLOWED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 12) is DENIED.  The decision of the Commissioner is REVERESED and REMANDED for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:   March 15, 2016


_____ *s/ Tom Schanzle-Haskins* _____
UNITED STATES MAGISTRATE JUDGE